ESTATE OF ENGELS: CAMARDESE, Appellant, vs. ESTATE OF ENGELS, Respondent.

*March 7—April 3, 1951.*

For the appellant there was a brief by *Martin, Clifford, Warne, Duffy & Dewane* of Green Bay, and oral argument by *G. F. Clifford* and *Melvin W. Dewane*.

For the respondent there was a brief by *Kaftan, Kaftan & Kaftan* of Green Bay, and oral argument by *J. Robert Kaftan*.

FRITZ, C. J.  Henry Engels was over eighty years of age when he died in 1950. He had eleven children. His daughter Ruth lived in California, and there married the claimant Joseph Camardese in 1946. They immediately moved to Green Bay and lived there with Henry Engels and his wife in a completely furnished home owned by Henry Engels. Camardese and his wife had no house or adequate furniture. Henry Engels and his wife (until she died in 1949) and Camardese and his wife and their two children (born in Green Bay) lived in the house as one family until Henry Engel's death. All of them had the use of the entire house and ate at the same table, and Camardese contributed $15 per week to the living expenses of the family, and the rest of the expenses, including the use of the house, were contributed by Henry Engels, and that continued until August, 1949, when Mrs. Engels died. Henry Engels had some savings but no income.

On March 28, 1947, Robert Engels, a son of Henry Engels, was given a general power of attorney signed by the latter, and thereafter Robert had charge of the father's personal affairs, although in view of his mental condition it was doubtful whether Robert actually had legal authority to act for the father. But Robert's power to act for his father was recognized by Camardese and his wife and all of the children of Henry Engels, and until his death all his financial affairs were actually handled by Robert. On December 12, 1947, Henry Engels broke his hip and was taken to a

hospital, and remained there until February 14, 1948, when at the request of Camardese he was brought back to his home. After a conference between all of Henry Engels' children it was agreed that Camardese and his wife and their children would continue to live in Henry's house, and would take care of him and furnish him with a home and the necessities of life, but that no cash would be paid by him to Henry because he had become senile and mentally incompetent and could not handle his affairs. Camardese was not present at that conference between the children, which included his wife, but he was in the house and the final decision was not made until he was consulted and had agreed. There was the same family arrangement as before, excepting that after Mrs. Engels' death in 1949, instead of Camardese contributing $15 per week, which was handled by Mrs. Engels, he was to furnish the food and services. Camardese described the arrangement as follows:

"*Q.* In other words these members (all children of Henry Engels) you specified here what was your agreement with them? *A.* They first asked me to take care of Mr. Engels. They asked my wife first, if we would stay with dad—that's Mr. Engels—in his house and take care of the house."

Robert Engels testified:

Camardese asked me if we could take care of him at home, and I agreed with him it would be all right. He rendered valuable services and often told me that he would not charge a cent for it. "He said it would be all right with them, and they would be glad to stay there until anything happens or anything unsatisfactory, they would move; if anything goes wrong, they would let us know." At no time did Mr. Camardese ever say he was not satisfied with the arrangement. He never at any time was dissatisfied according to his conversation. He always said he would not charge a cent; was too glad to do that for his father-in-law, and never wanted anything for it. The first time I heard of any talk by him about being paid for his services was when he filed his claim in

court. "I agreed with Mr. Camardese when he asked if it was all right to take dad home. . . . He said he wouldn't charge anything for it at any time."

There was no dispute whatever as to the truth of that testimony. It was not denied by testimony of Camardese or any other evidence. Camardese's only statement on rebuttal was that he "figured they would pay him something."

At the conclusion of the testimony the court found that Camardese rendered services to Henry Engels by furnishing nursing care and support from February 14, 1948, to August 9, 1949; and that he was in such physical and mental condition as to reasonably require the support and care rendered to him by the claimant. And the jury found that such support and nursing care were rendered by claimant in the expectation that he would be compensated therefor; and that the reasonable value of such services, after deducting the reasonable rental value of the premises, was $2,100. On motions after the verdict the court stated that the amount awarded by the jury for services was not excessive; but the court concluded:

". . . in view of the long line of cases in Wisconsin holding that under circumstances where a person cares for a relative, by blood or marriage, he is presumed to do it gratuitously, I fail to see how I can allow this claim. The contention of counsel for the claimant that, because of the incompetence of Henry Engels, no bargain could be made, in my opinion is not, under the facts in this case, sufficient to distinguish it from such cases, as for instance, *Estate of Goltz*, 205 Wis. 590. . . . the entire course of dealing between Camardese and the children of Henry Engels indicates that, if Camardese had expected to be paid, he could have very easily, and should have, discussed the matter with some of the children of Henry Engels. . . . the court must follow what he believes to be the Wisconsin law as declared by our supreme court, therefore, without citing more authorities, I must direct judgment to be entered dismissing the claim."

Under the decisions in this state the judgment must be affirmed. In *Estate of Goltz,* 205 Wis. 590, 594, 596, 597, 238 N. W. 374, the court stated:

"The law is well established that 'where near relatives by blood or marriage reside together as one common family, and one of them renders services to another, and such other furnishes him board and lodging or other necessaries or comforts, a presumption arises that neither party intended to receive or to pay compensation for the services rendered on the one hand, or for the board and lodging or other necessaries or comforts on the other; that they were intended as mutual acts of kindness done or furnished gratuitously.' *Estate of Kessler,* 87 Wis. 660, 664, 59 N. W. 129; *Schmidt's Estate,* 93 Wis. 120, 67 N. W. 37; *Williams v. Williams,* 114 Wis. 79, 89 N. W. 835; *Estate of Skinner,* 189 Wis. 390, 207 N. W. 942. . . .

"Since the facts of this case bring it within the rule stated and give rise to the presumption of gratuitous services, it was incumbent upon the claimant to prove an express contract by direct and positive evidence or to prove by unequivocal facts and circumstances that which is the equivalent of direct and positive proof of an express contract. . . .

". . . It seems clear that when such a relationship once exists between members of a family closely related by blood or marriage it presumptively continues until changed or overcome by positive and direct proof of an express contract or by circumstances from which an express contract to compensate may be inferable. . . .

"Claims of this nature should be carefully scrutinized and the evidence offered in support of them carefully weighed. Such claims should not be allowed unless founded on express contract or on positive and direct proof of circumstances amounting to the equivalent of an express contract. . . .

"The mere fact that the advanced age of a member of such a family brings to those performing services for him greater burdens and responsibilities is not sufficient to prove an express contract to compensate. *Estate of Skinner, supra.* In the absence of an express contract in a situation like this, compensation cannot be awarded out of mere equitable considerations however appealing they may be."

In *Estate of Grossman,* 250 Wis. 457, 458, 461, 27 N. W. (2d) 365, we stated:

"The question presented is whether a daughter who was employed and maintained living quarters in the city of Milwaukee, Wisconsin [earning about $200 a month], can recover for services rendered in caring for her mother and father who lived at Dale, Wisconsin, where there was no express contract to pay for such services.

"The presumption is that the services so rendered were gratuitous. [Citations.] It was therefore incumbent upon the claimant to prove an express contract by direct and positive evidence or to prove by unequivocal facts and circumstances that which is the equivalent of direct and positive proof of an express contract. . . .

". . . The testimony shows that the father requested her to come home and perform the services rendered for her mother. There is no testimony that he requested her to come home and care for him during his illness, . . .

"While proof offered by claimant to overcome the presumption that the services were gratuitous is not too strong, it is considered sufficient to overcome the presumption and sustain the trial court in granting judgment for the services rendered during the extended periods above set forth. . . .

"There is nothing to indicate that the father requested her to come home at the times in question, and certainly no parent would expect to pay a child for services when she occasionally drops in to visit for a day or two at a time. It follows that the balance of the claim for services and expenses of travel must be disallowed."

In this case Camardese, upon coming to Green Bay in 1946, lived with his wife and later their two children in the furnished home of Henry Engels and his wife as one common family, and Camardese contributed $15 per week to their living expenses until, after Mrs. Engels died in 1949, his wife was in charge of the household. When Henry Engels fractured his hip he was taken to the hospital on December 12, 1947, and remained there until on February 14, 1948, he was taken back to his home at the request of Camardese, who

told Robert Engels that he would take care of him and not charge a cent for it, and that he was glad to do that for his father-in-law and never wanted anything for it. Henry Engels was in such impaired mental condition that his son Robert had to take charge of his personal affairs. There continued then the same common family arrangement excepting that after Mrs. Engels' death, Camardese instead of contributing $15 per week, which was handled by Mrs. Engels, furnished food and care and also the services which Camardese had volunteered to take care of Henry Engels and said he would never want anything for. In view of said family relationship there is no obligation, under the above-stated circumstances, for any additional services voluntarily rendered by Camardese, in the absence of a contract with a duly appointed guardian of the deceased. According to Camardese's contention the need for more and better service in the care and nursing of Henry Engels continued for five hundred forty-two days after his return from the hospital until his death. If so there was ample time for the appointment of a guardian with whom Camardese could have contracted for compensation for the additional services which he seeks to recover in this case. In the absence of such an express contract there was no legal obligation for the additional services rendered by Camardese. *Schramek v. Shepeck,* 120 Wis. 643, 98 N. W. 213. There are cases in a few jurisdictions in which it has been held under somewhat different circumstances that such an express contract is not necessary in order to recover on a claim for necessaries against a party who is not *sui juris;* but that rule is not applicable in this state.

*By the Court.*—Judgment affirmed.